**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF MINNESOTA**

CITY OF WHITE BEAR LAKE,
MINNESOTA,

      Plaintiff,       CASE NO. 18-cv-03498

v.              JURY TRIAL DEMANDED

KOPPERS INC., BEAZER EAST, INC.,
RUETGERS CANADA INC., RAIN
CARBON HOLDINGS LLC, RAIN
CARBON INC., STELLA-JONES CORP.,
STELLA-JONES INC., COOPERS CREEK
CHEMICAL CORPORATION, LONE
STAR SPECIALTY PRODUCTS, LLC,
BONSAL AMERICAN, INC., SPECIALTY
TECHNOLOGY AND RESEARCH, INC.,
VANCE BROTHERS, INC. and THE
BREWER COMPANY.

      Defendants.

**AMENDED COMPLAINT**

   Plaintiff by its attorneys, Weitz & Luxenberg, P.C., Super Law Group, LLC, and Gray

Plant Mooty, hereby allege as follows:

**I.  SUMMARY OF THE CASE**

   1.  Contamination caused by Defendants' defective coal tar products has

contaminated Plaintiff's stormwater ponds and other stormwater infrastructure, imposing

substantially increased disposal costs on Plaintiff when it engages in maintenance activities,

particularly when it dredges its ponds.

   2.  Defendants Koppers Inc., Beazer East, Inc., Ruetgers Canada Inc., Rain Carbon

Holdings LLC, Rain Carbon Inc., Stella-Jones Corp., Stella-Jones Inc., Coopers Creek Chemical

Corporation, and Lone Star Specialty Products, LLC are referred to herein as the "Refiner Defendants." The Refiner Defendants take raw or crude coal tar—a toxic material left over from coal coking—and refine it into a variety of products, including a product manufactured, marketed, and sold specifically to be used as the binding agent in pavement sealants.

3.      Each of the Refiner Defendants specially manufactured, marketed, and sold Refined Coal Tar products for use in pavement sealant. These products are variously called refined tar, refined coal tar, "Refined Tar-12," "RT-12 Emulsion Tar," road tar, or pavement sealer base. In this complaint, the Refiner Defendants' products are referred to as "Refined Coal Tar."

4.      Refined Coal Tar contains high levels of toxic chemicals called Polycyclic Aromatic Hydrocarbons ("PAHs").

5.      Refiner Defendants marketed and sold their specially Refined Coal Tar products to companies that manufacture pavement sealants.

6.      Pavement sealants made with Refined Coal Tar are referred to herein as "Coal Tar Pavement Sealant."

7.      Refiner Defendants have known for decades that their Refined Coal Tar products contain high levels of PAHs.

8.      Refiner Defendants also have known for decades that the PAHs in their products inevitably would end up in the environment if used in a pavement sealant that is then subjected to ordinary wear and tear.

9.      Nevertheless, the Refiner Defendants marketed and sold Refined Coal Tar products as safe and effective components of pavement sealant.

10.     Refined Coal Tar is a defective product and a defective component of pavement sealant.

11.     Defendants Bonsal American, Inc., Beazer East, Inc., Coopers Creek Chemical Corporation, Specialty Technology And Research, Inc., Vance Brothers, Inc. and The Brewer Company are manufacturers of Coal Tar Pavement Sealant.  They are referred to herein as the "Manufacturer Defendants."

12.     Coal Tar Pavement Sealant is made by mixing Refined Coal Tar with dyes and other additives, and with aggregate material such as sand or clay.

13.     Most Coal Tar Pavement Sealants are applied by paving companies. Coal Tar Pavement Sealants also are sold at retail for personal use by homeowners.

14.     Coal Tar Pavement Sealants are used to protect paved surfaces, but they wear out. Sunlight and the elements attack these sealants continuously. Tires and snowplows abrade the surface into fine, PAH-laden particles that are blown away by wind or washed away by rain. Accordingly, sealant manufacturers—including the Manufacturer Defendants—recommend reapplication every few years.

15.     The Manufacturer Defendants market and sell Coal Tar Pavement Sealants as safe and effective coatings for use on paved surfaces.

16.     In fact, Coal Tar Pavement Sealant is a defective product because it includes a defective component product—Refined Coal Tar.

17.     Manufacturer Defendants have a reasonable alternative and need not incorporate the defective Refined Coal Tar in their pavement sealants.  Pavement sealants made with alternative binding agents such as asphalt (a tar refined from crude oil instead of coal) are similar in price, appearance, and function, but contain substantially lower levels of PAHs—lower by

orders of magnitude.  All of the Manufacturer Defendants manufacture both defective Coal Tar Pavement Sealants and non-coal-tar-based pavement sealants.

18.     In or about 2004, all of the Defendants became aware of studies conducted by the U.S. Geological Survey, and then later also by the Minnesota Pollution Control Agency, documenting links between the use of Refined Coal Tar in pavement sealants and a rise in PAH contamination levels.

19.     Rather than acknowledging these studies' findings, an industry association whose members include Refiner Defendants and Manufacturer Defendants launched an aggressive campaign to dispute the findings—in spite of the fact that they knew that their products inevitably degrade and end up in the environment.

20.     These studies have established that the concentrations of PAHs in the sediments of urban waterbodies affected by Defendants' Refined Coal Tars and Coal Tar Pavement Sealants exceed cleanup standards established by the Minnesota Pollution Control Agency.

21.     Plaintiff maintains stormwater ponds and other stormwater infrastructure devices that are designed to collect stormwater runoff and capture sediment.  The stormwater ponds in particular capture and filter runoff, and as such, they need to be maintained and dredged periodically.

22.     The PAH contamination from the Refiner Defendants' and the Manufacturer Defendants' products has accumulated in Plaintiff's stormwater ponds and other stormwater infrastructure devices.  Sediment and other materials contaminated with PAHs cannot be disposed of in the same manner as waste materials that do not contain those PAHs.

23.     Additionally, that maintenance and disposal of dredged material from ponds as a contaminated waste will require special handling.  Disposal costs of contaminated sediment and

other materials are significantly higher than costs associated with disposing non-contaminated sediment and other waste materials. This has increased or will increase Plaintiff's costs for managing its stormwater ponds and other stormwater infrastructure devices.

24.     Because of the PAH contamination described herein, the State of Minnesota banned the use and sale of Coal Tar Pavement Sealants.  Even though Coal Tar Pavement Sealants can no longer be sold or applied legally in Minnesota, the degradation of sealants previously applied has caused and continues to cause Plaintiff damages in the form of increased need to test stormwater sediments and increased disposal costs for PAH-contaminated dredged waste.

25.     Plaintiff brings this action to recover compensatory damages including all costs to investigate, monitor, abate, contain, prevent, treat, remove, and dispose of PAHs from its property and waters, and to ensure that the responsible parties bear such expense, rather than Plaintiff or its citizens and taxpayers.

## II.     PLAINTIFF

26.     Plaintiff is a municipal corporation and political subdivision of the State of Minnesota.

27.     Plaintiff currently owns, operates, and maintains multiple stormwater ponds and other stormwater infrastructure devices that are contaminated by the release of toxic chemicals from Defendants' products.

## III.     DEFENDANTS

28.     Defendant Koppers Inc. is a Pennsylvania corporation with a principal place of business at 436 Seventh Avenue, Pittsburgh, PA 15219.

29.     Defendant Beazer East Inc. is a Delaware corporation with a principal place of business at 1 Oxford Center, Pittsburgh, PA 15219.

30.     Beazer East Inc. is the corporate successor of companies that operated a coking facility in St. Paul, Minnesota that produced coal tar pitch from 1917 until 1981.   Those predecessor companies also refined coal tar pitch into Refined Coal Tar for use in pavement sealant.   On information and belief, some of the coal tar pitch refined in St. Paul was made into pavement sealants, applied in Minnesota, and released PAHs that now contaminate Plaintiff's ponds.

31.     Defendant Ruetgers Canada Inc. is a Canadian corporation with a principal place of business at 725 Strathearne Avenue North, Hamilton, ON L8H 5L3.

32.     Defendant Rain Carbon Holdings LLC is a Delaware corporation with a principal place of business at 10 Signal Road, Stamford, CT 06902.

33.     Defendant Rain Carbon Inc. is a Delaware corporation with a principal place of business at 10 Signal Road, Stamford, CT 06902.

34.     Defendant Stella-Jones Corp. is a Delaware corporation with a principal place of business at 603 Stanwix St. Ste. 1000, Pittsburgh, PA 15222.

35.     Defendant Stella-Jones Inc. is a Canadian corporation with a principal place of business at 3100 Cote Vertu, Suite 300, Saint-Laurent, Quebec, H4R 2J8.

36.     Stella-Jones Inc. is the parent corporation of Stella-Jones U.S. Holding Corporation, which is the parent corporation of Defendant Stella-Jones Corporation.

37.     On information and belief, the Stella-Jones defendants currently maintain a place of business in Duluth, Minnesota.

38.     On information and belief, Stella-Jones Corp. is the successor entity of the coal tar refiner Tangent Rail Corp. and its subsidiary, Tangent Rail Energy, Inc.   Both Tangent

entities maintained a place of business in Minnesota and Tangent Rail Energy, Inc. was registered with the State of Minnesota to do business in the state.

39.     Defendant Coopers Creek Chemical Corporation is a Pennsylvania corporation with a principal place of business at 884 River Road, Conshohocken, PA 19428.

40.     Defendant Lone Star Specialty Products, LLC (also d/b/a Lone Star Specialties, LLC) is an Oklahoma corporation with a principal place of business at 4200 East Skelly Drive, Tulsa, OK 74135-3247.

41.     Defendant Bonsal American, Inc. is a Delaware corporation with a principle place of business at 8201 Arrowridge Boulevard, Charlotte, NC 28273.

42.     Defendant Vance Bros, Inc. is a Missouri corporation with a principle place of business at 5201 Brighton Ave., Kansas City, MO 64130.

43.     Defendant The Brewer Company is an Ohio corporation with a principle place of business at 1354 US Highway 50, Milford, OH 45150.

44.     Defendant Specialty Technology And Research, Inc. ("STAR"), is an Ohio corporation with a principle place of business at 1150 Milepost Drive, Columbus, OH 43228

45.     The Refiner Defendants are coal tar refiners who marketed Refined Coal Tar for use in pavement sealants.

46.     The Manufacturer Defendants specified, designed, manufactured, marketed and supplied Coal Tar Pavement Sealants for use on roads, driveways, parking lots, schoolyards, and other surfaces.

47.     When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately

supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment, or agency.

48.     Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendants.

## IV.     JURISDICTION AND VENUE

49.     Plaintiff is a citizen of the State of Minnesota.  Defendants are citizens of States other than the State of Minnesota, or citizens of Canada.  This is an action between citizens of different States, in which the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.

50.     Based upon information and belief, Defendants transact or transacted business within the State of Minnesota, or contract or contracted to supply goods or services in Minnesota during the time frame relevant to the allegations herein.

51.     In addition, this Court may exercise personal jurisdiction over Defendants because they are either authorized to do business in Minnesota, are registered with the Minnesota Secretary of State, do sufficient business with sufficient minimum contacts in Minnesota, or otherwise sought to take advantage of the Minnesota market through the distribution and marketing of Refined Coal Tar and Coal Tar Pavement Sealant products for use in pavement sealants in Minnesota—including through membership and participation in the Pavement Coatings Technology Council—to render the exercise of jurisdiction over Defendants by the Minnesota courts consistent with traditional notions of fair play and substantial justice.

52.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the events giving rise to the claim occurred and the property that is the subject of the action is within the District of Minnesota.

## V.     FACTUAL ALLEGATIONS

### A.     POLYCYCLIC AROMATIC HYDROCARBONS ("PAHS") AND COAL TAR

53.     Polycyclic Aromatic Hydrocarbons, or "PAHs," are a group of chemical compounds that form whenever anything with a carbon base, such as coal, is incompletely burned.

54.     PAHs are dangerous to the environment.  According to the U.S. Environmental Protection Agency ("EPA"), PAHs are an environmental concern because several are toxic and also persistent—that is, they can stay in the environment for extremely long periods of time. Most do not break down easily in water or the environment.

55.     EPA has designated 16 PAHs as priority pollutants (listed at 40 CFR Part 423, Appendix A) because of their toxicity.

56.     At least eight of the 16 priority PAHs are present in coal tar.

57.     Refined Coal Tar begins its life as a byproduct of the coking of coal for the steel industry.  The coking process involves heating coal at high temperatures to force out impurities and produce coke, which is almost pure carbon.  Coke is used by the steel industry in blast furnaces that convert iron ore to steel.  The leftover waste from this partial combustion of coal to form coke is called raw or crude coal tar, and it is loaded with PAHs.

58.     Refiner Defendants distill crude coal tar primarily for the production of certain chemicals, oils, industrial feedstocks and other products.  After removing various oils from the crude tar, what remains is coal tar pitch.

59.     Coal-tar pitch is 50 percent or more PAHs by weight.

60.     Most of the coal tar pitch produced in North America is used as a binder in industrial processes, such as aluminum production.

61.     Refiner Defendants also process some coal tar pitch into a Refined Coal Tar product often referred to in the industry as "Refined Tar 12" or "RT-12."

62.     The Refiner Defendants specifically formulated Refined Coal Tar for use in pavement sealants, marketed their products for use in pavement sealants, and sold their products to sealant manufacturers, including the Manufacturer Defendants.

63.     The Refined Coal Tar that Refiner Defendants sell for use in pavement sealant products can contain upwards of 50 percent PAHs by weight.

64.     Depending on price and availability, a sealant manufacturer may purchase Refined Coal Tar from several different suppliers throughout a given time frame.

65.     Coal Tar Pavement Sealants typically consist of 20 to 35 percent Refined Coal Tar as a binder.

**B.     COAL TAR-BASED AND ASPHALT-BASED SEALANTS**

66.     Coal Tar Pavement Sealant, or sealcoat, is a black liquid that is sprayed or painted on paved surfaces, such as driveways, parking lots and, occasionally, playgrounds in order to beautify and protect the paved surface below from oil damage and weathering.

67.     Some of the PAHs from Refined Coal Tar begin to evaporate out of the sealant and enter the environment almost immediately upon application. And within a few years, the combination of friction from vehicles and exposure to the elements causes the Coal Tar Pavement Sealant to degrade into a fine particle dust containing more PAHs.  Some of the particle dust blows away on the wind and is deposited widely.  Some of the Coal Tar Pavement Sealant particles get washed away—carried by stormwater into drains, sewers, and other

stormwater management devices, and ultimately into Plaintiff's stormwater ponds and other stormwater infrastructure devices.

68.     Coal Tar Pavement Sealants quickly degrade and end up as a fine toxic dust that accumulates on the ground and in Plaintiff's stormwater ponds.

69.     In contrast, some pavement sealants are made from asphalt, not coal tar.

70.     Asphalt is a tarry substance refined from crude oil, not coal.  Asphalt can be used to make an alternative to Coal Tar Pavement Sealants: asphalt-based sealants.

71.     Asphalt-based sealants have about 1,000 times lower concentrations of PAHs than Coal Tar Pavement Sealants.

72.     According to the U.S. Geological Survey ("USGS"), PAH concentrations in asphalt-based sealants are around 50 mg/kg, while Coal Tar Pavement Sealants normally have PAH concentrations ranging from 50,000 to 100,000 mg/kg, although the PAH concentrations in some Coal Tar Pavement Sealants exceed 200,000 mg/kg (*i.e.* 20 percent PAHs).

73.     Coal Tar Pavement Sealants are commonly used in the central, southern, and eastern United States.  Asphalt-based sealants are commonly used in the western United States.

74.     Studies conducted by the USGS show that PAHs in dust on pavement sealants in the central and eastern United States, where Coal Tar Pavement Sealants are predominantly used, are about 1,000 times higher than in the western United States where asphalt-based sealants are more commonly used.

75.     Although they have radically different PAH concentrations, coal-tar-based and asphalt-based sealants are similar in appearance and price.

### C.    COAL TAR PAVEMENT SEALANTS ARE A MAJOR SOURCE OF CONTAMINATION

76.    The USGS has identified an unusual trend: PAH concentrations in the environment are increasing in in the United States, even as concentrations of other contaminants are decreasing.

77.    The USGS has concluded that PAHs released from Refined Coal Tar used in Coal Tar Pavement Sealants may now be the largest active source of PAHs in the United States, that sealants made with Refined Coal Tar emit more PAHs into the environment every year than the entire U.S. vehicle fleet, and that these sealants are the largest sources of PAH contamination and are the primary cause of the upward trend in PAH concentration levels since the 1960s.

78.    Research conducted independently by the Minnesota Pollution Control Agency ("MPCA") confirms that many of the USGS findings apply to Minnesota.

79.    PAH contamination from Coal Tar Pavement Sealants spreads widely from its point of origin.

80.    The USGS has found that a very large fraction of the PAHs found in Coal Tar Pavement Sealants tends to volatilize into the air in the months after application.  Some of these volatilized PAHs are later deposited elsewhere in the environment.

81.    In addition, particles of sealant that degrade are small and light enough to be blown around by the wind, picked up on car tires, and otherwise transported significant distances from their point of origin.  The USGS found that in cities where use of Coal Tar Pavement Sealant is common, even samples collected from unsealed parking lots exhibit higher PAH concentrations than similar parking lots from cities where use of coal tar sealant is rare.  The USGS hypothesizes that the difference in PAH levels on unsealed parking lots in these different cities occurs because PAH-contaminated dust from coal-tar sealed parking lots is being transported widely, including to unsealed parking lots.

82.     Because the extent and severity of the problem have only recently come to light, waterbodies are not routinely tested for the presence of PAHs.  Consequently, although the contamination problem is widespread, only a handful of the hundreds of thousands of waterbodies polluted by Refined Coal Tar and Coal Tar Pavement sealants are recognized as environmentally impaired by the states or the federal government.  Similarly, in most of the country, sediments and wastes that must be disposed of are not routinely tested for PAHs.

### D.   DEFENDANTS HAVE NOT ISSUED WARNINGS ABOUT THE RELEASE OF PAHS FROM THEIR PRODUCTS OR ABOUT THE RISK OF SUBSEQUENT ENVIRONMENTAL CONTAMINATION.

83.     At all times relevant to this action, the Defendants knew or should have known that they were manufacturing and distributing products that contained millions of pounds of PAHs every year; that pavement products degraded and wore away over a few years; and that if Coal Tar Pavement Sealant products are made with Refined Coal Tar then this degradation process will release PAH-laden wastes into the environment.

84.     Refiner Defendants never warned their direct customers of the danger that if Refined Coal Tar is used in pavement sealant then, as the sealant degrades and wears away, the Refined Coal Tar will release PAHs into the environment.

85.     Refiner Defendants never warned end users of the danger that if Refined Coal Tar is used in pavement sealant then, as the sealant degrades and wears away, the Refined Coal Tar will release PAHs into the environment.

86.      Despite the failure of Refiner Defendants to warn anyone, Plaintiff alleges on information and belief that, not later than 2004, as a result of research led by the USGS, the Manufacturer Defendants became aware that as their Coal Tar Pavement Sealant products degraded, PAHs were being released from the Refined Coal Tar contained in their sealant and

entering the environment at levels that caused harm to the environment, particularly Plaintiff's stormwater ponds and other stormwater infrastructure devices.

87.   The Manufacturer Defendants have never warned customers or end users of this danger that if Refined Coal Tar is used in pavement sealant the Refined Coal Tar will release PAHs into the environment as the sealant degrades and wears away.

88.   Manufacturer Defendants did not instruct customers, or agents such as subcontractors, franchisees, and others, to avoid applying Coal Tar Pavement Sealants made with Refined Coal Tar in areas that would drain into stormwater ponds or other stormwater infrastructure devices, where subsequent removal of PAHs will be necessary.

### E.   THE PAVEMENT COATINGS TECHNOLOGY COUNCIL AND ITS MEMBERS FALSELY CLAIM THAT COAL TAR PAVEMENT SEALANTS ARE SAFE AND DO NOT CAUSE POLLUTION.

89.   The Pavement Coatings Technology Council ("PCTC") is an association composed primarily of coal tar refiners and coal tar pavement sealant manufacturers.

90.   On information and belief, Defendants Koppers Inc., Ruetgers Canada Inc., Stella-Jones Corp., Stella-Jones Inc., Coopers Creek Chemical Corporation, Lone Star Specialty Products, LLC, Bonsal American, Inc., STAR, Inc., Vance Brothers, Inc. and The Brewer Company are members of the PCTC. These Defendants are referred to herein as the "PCTC Defendants."

91.   The PCTC Defendants make up the majority of the PCTC's membership.

92.   Through the PCTC, Refiner Defendants participated substantially in the design of coal tar sealants, creation of guidance for use of coal tar sealants, and integration of refined coal tar into the design of coal tar sealants.

93.   Anne LeHuray, executive director of the PCTC, was quoted in a February 17, 2009 article published on the website ForConstructionPros.com stating that the PCTC "has

assumed a more aggressive role advocating in defense of Refined Coal Tar sealer."   Ms. LeHuray also said that the PCTC is "countering misinformation" and "making sure the right information is getting out."

94.     Girish Dubey is the president of STAR Inc. and a founder of the PCTC.   Mr. Dubey was quoted in a recent article stating that the PCTC is "essentially a public relations arm for the sealcoating industry."

95.     Pursuant to its members' agreement to publicly counter the findings of the USGS to prevent their products from local and statewide bans, as well as other negative publicity about their products, the PCTC made numerous public representations that it knew were false, including the following:

96.     On March 24, 2010, Ms. LeHuray published an article about Coal Tar Pavement Sealant on the website ForConstructionPros.com. She wrote that "PCTC member companies and contractors have safely used this product for six decades and have no reason to think there are any adverse effects when used according to manufacturers recommended specifications," when at that time she and the PCTC knew about the USGS findings.

97.     On April 27, 2010, the PCTC submitted comments to the White Bear Lake, Minnesota, City Council stating that "ratios [of PAHs] of sediments collected from Varney Pond in White Bear Lake and ten ponds in Minneapolis are inconsistent with [coal tar] sealants or particles from [coal tar] sealed parking lots."

98.     On August 11, 2011, the PCTC submitted a letter to the City of Edina, Minnesota, stating that bans on coal tar-based pavement sealant are based on "faulty and incomplete science."   In this letter, the PCTC also stated that the product "has been safely used for more than six decades."   The letter went on:

> Ban advocates are unable to identify any harm actually caused by sealers in the real world.  Rather, advocates engage in misrepresenting possible hazards as actual risks.

99.     At a December 13, 2011 meeting of the Minnesota Pollution Control Agency ("MPCA"), the PCTC submitted materials stating that "refined tar-based sealers are not an important source of PAHs in sediments in general," and that "refined tar-based sealers are not a source at all of PAHS in many of the localities identified by the USGS' mathematical models."

100.     In a March 5, 2012 article published on ForConstructionPros.com, Ms. LeHuray stated:

> Further analysis and scrutiny of PAH "fingerprints" in data published by the U.S. Geological Survey (USGS) linking PAH's in sediments to refined tar-based sealers have now shown that refined tar-based sealers *can't* be identified as a source—predominant, significant or merely identifiably part of the mix of sources—of PAHs in the USGS data.

101.     On May 6, 2013, Robert Weaver, a PCTC lobbyist, testified before the Maine Legislature that, a ban on coal tar sealants "would harm a large number of small businesses in Maine, and would do so without creating any sort of identifiable environmental benefits."

102.     On January 21, 2014, the PCTC submitted a letter to the members of the Great Lakes Coal Tar Sealcoat PAH Reduction Project.

103.     The Great Lakes Coal Tar Sealcoat PAH Reduction Project is a federally funded initiative led by the MPCA with the participation of the Solid & Hazardous Waste Education Center at the University of Wisconsin, the Michigan Department of Environmental Quality, U.S. EPA Region 5, and the Great Lakes Regional Pollution Prevention Roundtable.

104.     In its January 21, 2014, letter, the PCTC stated:

> a.   "Although Minnesota may have instituted a ban on [refined tar-based pavement sealcoat], it is not based on sound science."

b. "[Refined-Tar-Based Pavement Sealcoat] Bans Have Not Been Shown to Reduce PAHs in Sediment."

c. "[Refined-Tar-Based Pavement Sealcoat] was not an identifiable source of PAHs in Austin sediments before or after the ban." (Austin, Texas was the first city in the United States to ban coal tar sealants.)

105.   In these and many similar statements, including multiple statements directed specifically to the public and governments in Minnesota, the PCTC and its members have claimed that coal tar sealants are safe to use, have been proven safe over six decades, do not harm the environment, are not a significant source of PAHs in the environment or in Plaintiff's ponds, when they knew their statements were not true and that there was evidence to the contrary.  All of the above statements of the PCTC and its members are false, or at the very least misleading, deceptive, incomplete or misrepresentative.

106.   At all times that the PCTC and its members have made such statements, they have known them to be false and misleading.

107.   The PCTC and its members have made such statements intending that consumers and others will rely on them to continue purchasing and using Coal Tar Pavement Sealants, and intending to preserve the market for Refined Coal Tar and Coal Tar Pavement Sealants by stopping or delaying government action to restrict use or sale of sealants.

**F.   THE PAVEMENT COATINGS TECHNOLOGY COUNCIL AND ITS MEMBERS HAVE ATTACKED SCIENTIFIC RESEARCH AND RESEARCHERS THAT FIND ENVIRONMENTAL HARMS ARISING FROM USE OF COAL TAR PAVEMENT SEALANTS.**

108.   On January 29, 2015, the PCTC published a blog post on its website criticizing a USGS research project.  The PCTC described the researchers as "[t]he USGS team that, based on

flawed 'science' has been conducting a taxpayer-funded advocacy campaign targeting RTS [refined tar sealants]."

109.    In a January 29, 2017 opinion piece published by the Norwich Bulletin, the PCTC stated, "Evaluations of the USGS studies have demonstrated how they have cherry-picked data and manipulated health risk calculations to support flawed conclusions about risk."  The opinion piece also stated that "the PCTC sympathizes with the board and local officials trying to sort through the alarmism on the internet, but we urge Pomfret and the state of Connecticut to make reasoned, evidence-based decisions rather than relying on flawed science such as that disseminated by the USGS."

110.    An attachment to a February 6, 2017 email sent by the PCTC to the Milwaukee Common Council states, "Activists who are campaigning against the use of refined tar-based pavement sealer (RTS) generally make arguments that rely on distortions and discredited interpretations of environmental and health science evidence."

111.    On a May 18, 2018 post on its website, the PCTC stated:

> USGS hydrologists have been shown to have manipulated data and used circular reasoning in their sealant studies. Independent studies contradict the USGS conclusions. Because substances containing PAHs have been thoroughly tested, studied and analyzed, the risks thought to be associated with exposures to PAH-containing materials are well understood by the scientific community.  * * * [T]he irrefutable conclusion reached by scientists is that these risks are low.

112.    The "independent studies" referred to by the PCTC in its May 18, 2018 website post were funded by the PCTC.

113.    In numerous statements made over the past 15 years, the PCTC has referred to research conducted by scientists at the USGS and its research partners at other governmental and academic institutions as discredited, distorted, faulty, unreliable, unsound and incomplete

science, based on flawed modeling, data, techniques and logic, "science" (quotations in original), exaggerated, biased, based on manipulated or cherry-picked data, misinformation, scientifically indefensible, and advocacy thinly disguised as scientific research.

114.    The PCTC has claimed publicly and repeatedly that the U.S. Geological Survey "is an agency with an agenda," that its staff are engaged in "advocacy science," have an "agenda to ban coal tar-based pavement sealants," are "fear mongering," and "conducting a taxpayer-funded advocacy campaign targeting RTS."   The PCTC has also claimed that "in the case of RTS, the USGS is aligned with the most extreme anti-chemical activists…."

115.    In these and many similar statements, including multiple statements directed specifically to the public in Minnesota and to governments in Minnesota, the PCTC and its members have claimed that there is no legitimate evidence that Plaintiff and others have been harmed, that there is no credible science demonstrating that coal tar sealants are harmful to the environment, or a significant source of PAHs in Plaintiff's stormwater ponds and other stormwater infrastructure devices.   The PCTC and its members also publicly and repeatedly impugn and attack the credibility and integrity of all of the scientists whose research says otherwise.

116.    All of the above statements of the PCTC and its members are false, misleading, deceptive, incomplete and misrepresentative.

117.    At all times that the PCTC and its members have made such statements, they have known them to be false, misleading, deceptive, incomplete and misrepresentative.

118.    The PCTC also claims that scientific researchers who have identified its members' products as dangerous, and particularly the USGS, refuse to acknowledge or engage with the PCTC and researchers it has funded.  For example, in its January 24, 2014 letter directed

to the Minnesota Pollution Control Agency and others, the PCTC referred to "the refusal of the USGS to acknowledge any conflicting opinions, research or studies on their coal tar sealant websites or within their presentations and press releases."

119.    The statements of the PCTC and its members claiming that government agencies, government scientists, and academic researchers who conduct research with government scientists all refuse to acknowledge and address the PCTC's criticisms of their work are false, or at the very least misleading, deceptive, incomplete and misrepresentative.    The PCTC's criticisms have been repeatedly addressed and refuted.    Specifically and relevant to the allegations here, both the USGS and the MPCA have offered direct responses to the PCTC's criticisms of their research in academic journals, in presentations, in federal proceedings brought by the PCTC under the Information Quality Act, and in other public forums.

120.    The PCTC has repeatedly written to academic journals requesting that USGS articles about coal tar sealants be retracted.

121.    No journal editorial board has ever retracted a USGS publication about coal tar sealant.

122.    The PCTC has filed multiple challenges to USGS and EPA publications about coal tar sealants under the federal Information Quality Act, seeking to have these publications retracted or corrected.

123.    No government agency or appellate body has ever retracted a government publication, retracted a publication's conclusions, or made any substantive change to the findings in response to a PCTC challenge to a government publication under the Information Quality Act.

124.    At all times that the PCTC and its members have made such statements, they have known them to be false and misleading.

125.    The PCTC and its members have made such statements with intent that consumers and others will rely on them to continue purchasing and using coal tar sealants.

126.    The PCTC and its members have made such statements with intent to preserve the market for coal tar sealants in Minnesota and beyond by stopping or delaying government action to restrict use or sale of sealants.

### G.    CERTAIN DEFENDANTS HAVE INDEPENDENTLY REPEATED OR AMPLIFIED THE PCTC'S FALSE CLAIMS.

127.    Some of the Defendants have made false statements that are similar or identical to those of the PCTC.

128.    Defendant Coopers Creek, through its Vice President Mark Morris, established the website "Truth About Coal Tar" (www.truthaboutcoaltar.com) in 2006.

129.    The website states that it was created "to provide information about Refined Tar-Based Pavement Sealers."  On the website, Coopers Creek republishes various PCTC materials. Through the website, Coopers Creek also states that:

a.    "Since 2003 to the present, The City of Austin, TX (COA) and The United States Geological Survey (USGS) have been highly visible with the findings of their suspect studies, and spreading false information about Refined Tar-Based Pavement Sealers."

b.    "This website is dedicated to show that both the City of Austin's (COA) studies and the USGS studies have overstated the link between Refined Tar-Based Pavement Sealers and environmental PAHs."

c.    "[T]here are major fundamental flaws in these [USGS] studies and therefore do not prove that Refined Tar-Based Pavement Sealers are a major source of PAHs in a watershed."

> d.   "This product [Coal Tar Pavement Sealant] has been used successfully and safely for over the past 60 years."

130.    In 2007, an article entitled "Dustup over Pavement Sealants" published in Chemical & Engineering News quoted Geoff Crenson, an employee of Defendant Bonsal American, Inc. and then chairman of the PCTC, stating that the first ban on Coal Tar Pavement Sealants in the United States "has not been driven by good science" and that adverse environmental effects from Coal Tar Pavement Sealants are "not really proven."

131.    In 2010, Rob Vance, then president of Defendant Vance Brothers Inc. was quoted in an article posted on ForConstructionPros.com stating that "As far as we're concerned, the studies and conclusions we're arguing about are based on interpretation . . . These people clearly attempt to single-source refined coal tar as responsible for all the PAHs they found and there's just no evidence to suggest that. We're asking our customers to contact us before jumping to any conclusions, and we're telling them to realize that PAHs are everywhere in the environment. A focus on just refined coal tar-based sealants won't reduce the amount of PAHs."

132.    On March 24, 2010, Girish Dubey, President of STAR, Inc., was quoted in an article published on ForConstructionPros.com stating that USGS studies of Coal Tar Pavement Sealants "are flawed and grossly extrapolated."  Mr. Dubey repeated these statements in 2018 in an article first published on the website www.pavemanpro.com and also posted to Defendant STAR, Inc.'s website.

133.    The March 24, 2010 article also describes statements made by Bill Maclean of Defendant The Brewer Company:

> Bill Maclean of The Brewer Company, which produces a refined coal tar-based sealer, adds that the sealcoating industry is committed to producing a quality, long-lasting refined coal tar product that is safe to use. "Everyone we know is trying to do the right thing," Maclean says.

* * *

"It is unfortunate that the research so far is one sided and subjective and that contradictory research is lagging. If you're going to have a debate like this you need to not cloud the issue," Maclean says.

134.     On December 17, 2013, the website of Defendant Vance Brothers Inc. was updated to include the claim that policy makers who had banned Coal Tar Pavement Sealants "were provided with flawed environmental modeling results."

135.     These statements are false, or at the very least misleading, deceptive, incomplete and misrepresentative.

136.     At the time that the above named Defendants made these statements, they knew them to be false and misleading.

137.     The above named Defendants made these statements with the intent to induce consumers and others to rely on them and to continue purchasing and using Coal Tar Pavement Sealants and to preserve the market for Coal Tar Pavement Sealants nationwide by stopping or delaying government action to restrict use or sale of sealants.

H.     **PLAINTIFF IS HARMED BY THE RELEASE OF PAHS FROM DEFENDANTS' PRODUCTS.**

138.     Plaintiff owns and maintains stormwater ponds and other stormwater infrastructure devices that are designed to capture and filter stormwater runoff by trapping sediment and various pollutants in the pond.

139.     PAHs released from Defendants' products have accumulated in the sediments at the bottom of Plaintiff's stormwater ponds and other stormwater infrastructure devices.

140.     Plaintiff is required to remove sediment from its stormwater ponds and other stormwater infrastructure devices periodically in order to maintain proper functionality.

141.     Dredged material from stormwater ponds is regulated by the Minnesota Pollution Control Agency as a waste pursuant to Minn. Stat. §§ 115.01 and 115.03, subd. 1(e).

142.     The MPCA's current guidance manual for the management of dredged materials explains that, in most circumstances, managers of dredged sediment from urban stormwater ponds are required to sample dredged sediments for the presence of PAHs.

143.     The results of these sampling efforts are measured against criteria called Soil Reference Values ("SRVs").  If pollution levels in the dredged material do not exceed any SRVs, the material may be reused or disposed of freely.  But if pollution levels exceed certain thresholds set in the SRVs, the dredged material must be disposed of at a solid waste facility, which requires both hauling the material to the facility and then paying a fee for disposal.

144.     The same testing and SRV standards apply also to other waste materials removed from Plaintiff's stormwater infrastructure.

145.     Accordingly, when PAH levels in stormwater pond sediments or other stormwater infrastructure devices exceed the Soil Reference Values, disposal costs rise dramatically.

146.     Plaintiff has incurred or will incur damages in the form of increased testing and disposal costs because of the PAHs released from Defendants' products.  These damages are expected to exceed $75,000.

147.     As Plaintiff's stormwater ponds reach capacity and are tested for sediment disposal and dredging, Plaintiff has incurred or will incur new injuries and its costs of disposal are expected to rise.

I.    PLAINTIFF IS HARMED BY DEFENDANTS' FALSE, DECEPTIVE, AND MISLEADING STATEMENTS.

148.    As a direct and proximate result of Defendants' false statements, misleading statements and deliberate omissions as alleged in this Complaint, Plaintiff's stormwater ponds and other stormwater infrastructure devices were contaminated with PAHs.

149.    Defendants' false, deceptive and misleading statements and practices led to the use of more sealants made with Refined Coal Tar in Minnesota than would have been used without Defendants' concerted efforts to protect their market through false, deceptive and misleading statements and practices.

150.    As a result of Defendants' false, deceptive and misleading statements and practices, the public continued applying the PCTC Defendants' products in larger quantities than would have otherwise been applied.

151.    As a result of Defendants' false, deceptive and misleading statements and practices, multiple governments in Minnesota delayed in restricting the use of these products longer than they would have otherwise.

152.    Accordingly, as a result of Defendants' false, deceptive and misleading statements and practices, more PAHs accumulated in Plaintiff's stormwater ponds and other stormwater infrastructure, causing nuisance, trespass, and damages.

153.    Therefore, Defendants' false, deceptive and misleading statements and practices contributed directly, proximately and significantly to Plaintiff's injuries.

## CLAIMS AGAINST REFINER DEFENDANTS

### FIRST CLAIM

**Strict Product Liability - Design Defect And/Or Defective Product (Refiner Defendants)**

154.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

155.    Refiner Defendants during the relevant time period were designers, manufacturers, refiners, formulators, sellers, marketers and suppliers of Refined Coal Tar for use in pavement sealants.

156.    As designers, manufacturers, refiners, formulators, sellers, marketers and suppliers of Refined Coal Tar for use in pavement sealants, Refiner Defendants owed a duty to all persons whom Refiner Defendants' Refined Coal Tars might foreseeably harm, including Plaintiff, not to market and sell any product which is unreasonably dangerous for its intended and foreseeable uses.

157.    Refiner Defendants represented, asserted, claimed and warranted that Refined Coal Tars could be used safely in pavement sealants, and that pavement sealants made with Refined Coal Tars could be used safely in the same manner as similar sealant products not containing Refined Coal Tar.

158.    When Refiner Defendants placed Refined Coal Tars into the stream of commerce, they were defective, unreasonably dangerous, and not reasonably suited for their intended, foreseeable and ordinary uses for the following reasons:

> a.   Refined Coal Tars contain high levels of PAHs and other chemicals, some of which are known carcinogens;

b.  Coal tar sealants typically are comprised of 20 to 35 percent of Refined Coal Tar;

c.  The PAH concentrations in some coal tar sealants exceed 200,000 mg/kg (i.e. 20 percent PAHs);

d.  As pavement sealants degrade, the PAHs and other substances originating in the Refined Coal Tar are released into the environment;

e.  When these released wastes accumulate in stormwater ponds, the cost of dredging and disposing of the stormwater sediment increases substantially;

f.  Refiner Defendants, with knowledge of the risks of using Refined Coal Tar in sealants, failed to use reasonable care and ignored these risks, and marketed and sold refined coal-tar products to manufacturers of pavement sealants;

g.  Refined Coal Tar and pavement sealants containing Refined Coal Tar pose greater danger to the environment than would be expected by ordinary persons exercising reasonable care;

h.  The risks that Refined Coal Tars specially manufactured and formulated for use in pavement sealants pose to the environment outweigh their utility in acting as a binding agent in those pavement sealants;

159.   The above-described defects exceeded the knowledge of the ordinary person and by the exercise of reasonable care neither Plaintiff nor the owners of paved surfaces located in

Plaintiff's city would be able to avoid the harm caused by pavement sealants made with Refined Coal Tar.

160.    Refined Coal Tar and pavement sealant products made with Refined Coal Tar were distributed, sold, applied and otherwise used in the manner intended or reasonably foreseen by Refiner Defendants, or as should have been reasonably foreseen by Refiner Defendants.

161.    Refined Coal Tar reached purchasers in a condition substantially unchanged from that in which it left Refiner Defendants' control.

162.    Refined Coal Tar was defective and unreasonably dangerous when the product left Refiner Defendants' control.

163.    As a direct and proximate result of Refiner Defendants' acts and omissions as alleged in this Complaint, Plaintiff's stormwater ponds and other stormwater infrastructure were contaminated with PAHs.   Plaintiff has incurred or will incur substantial investigation, remediation, cleanup, removal, treatment, disposal, and monitoring costs and expenses related to contamination of its properties and fulfillment of its obligations as a stormwater system operator, for which Refiner Defendants are strictly, jointly, and severally liable.

## SECOND CLAIM

### Strict Product Liability – Failure to Warn (Refiner Defendants)

164.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

165.    As designers, manufacturers, distributors, sellers, suppliers, and/or marketers of Refined Coal Tar specially formulated for use in pavement sealants, Refiner Defendants had a duty to warn against latent dangers resulting from foreseeable uses of their products about which Defendants knew or should have known.

166.    Products containing Refined Coal Tar purchased or otherwise acquired (directly or indirectly) from Defendants by third parties were applied, discharged, disposed of, or otherwise released at various locations, at various times, and in various amounts in the vicinity of Plaintiff's stormwater ponds and other stormwater infrastructure.

167.    Over time, these products containing Refined Coal Tar released the PAHs in the tar into the environment, and these PAHs accumulated in Plaintiff's stormwater ponds and other stormwater infrastructure devices.

168.    The products containing Refined Coal Tar were used in a reasonably foreseeable manner and without substantial change in the condition of such products.

169.    Refiner Defendants knew or should have known that the use of products containing Refined Coal Tar in their intended manner would result in the discharge, disposal, or release of PAHs into the environment.

170.    Products containing Refined Coal Tar used in the vicinity of Plaintiff's stormwater ponds and other stormwater infrastructure were defective in design and unreasonably dangerous because they contained a dangerous and unreasonably defective component: Refined Coal Tar.

171.    Despite the known and/or reasonably foreseeable hazards to the environment associated with the use of products containing Refined Coal Tar in the vicinity of Plaintiff's stormwater ponds and other stormwater infrastructure, Refiner Defendants failed to provide adequate warnings of, or take any other precautionary measures to mitigate, those hazards.

172.    In particular, Refiner Defendants failed to inform either end users or purchasers of Refined Coal Tar, including the Manufacturer Defendants, that the PAHs in the Refined Coal Tar will be released widely into the environment over time. Defendants failed to describe this or

related hazards or provide any precautionary statements regarding such hazards in the labeling of Refined Coal Tar or otherwise.

173.    As a direct and proximate result of Refiner Defendants' failure to warn of the hazards posed by using Refined Coal Tars specially formulated for use in pavement sealants, and their failure to warn of the hazards posed from use of sealant products made with Refined Coal Tar in the vicinity of stormwater ponds and other stormwater infrastructure, PAHs from Refined Coal Tar contaminate many of Plaintiff's stormwater ponds and other stormwater infrastructure devices.

174.    As a direct and proximate result of Refiner Defendants' acts and omissions as alleged herein, Plaintiff has incurred or will incur damages related to PAH contamination of its stormwater ponds and other stormwater infrastructure in an amount to be proved at trial.

175.    Refiner Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PAH contamination of the environment, and particularly contamination of stormwater ponds and other stormwater infrastructure devices that receive runoff from paved surfaces sealed with a Refined Coal Tar based product.

176.    Refiner Defendants committed each of the above-described acts and omissions knowingly and willfully. Such conduct was performed to promote sales of Refined Coal Tar and/or products containing Refined Coal Tar, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on the environment.

177.    Defendants are strictly, jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

## CLAIMS AGAINST MANUFACTURER DEFENDANTS

## THIRD CLAIM

### Design Defect And/Or Defective Product (Manufacturer Defendants)

178. Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

179. Manufacturer Defendants during the relevant time period, were designers, manufacturers, refiners, formulators, sellers, marketers and suppliers of Coal Tar Pavement Sealants.

180. As designers, manufacturers, refiners, formulators, sellers, marketers and suppliers of coal tar pavement sealants, Manufacturer Defendants owed a duty to all persons whom Defendants' Coal Tar Pavement Sealants might foreseeably harm, including Plaintiff, not to market and sell any product which is unreasonably dangerous for its intended and foreseeable uses.

181. Manufacturer Defendants represented, asserted, claimed and warranted that Coal Tar Pavement Sealants could be used safely in the same manner as similar products not containing Refined Coal Tar.

182. When Manufacturer Defendants placed Coal Tar Pavement Sealants into the stream of commerce, they were defective, unreasonably dangerous, and not reasonably suited for their intended, foreseeable and ordinary uses for the following reasons:

    a. Coal tar and Refined Coal Tar contain high levels of PAHs and other chemicals, some of which are known carcinogens;

    b. Coal tar sealants typically are comprised of 20 to 35 percent of Refined Coal Tar;

c.  The PAH concentrations in some Coal Tar Pavement Sealants exceed 200,000 mg/kg (i.e. 20 percent PAHs);

d.  As Coal Tar Pavement Sealants degrade, the PAHs and other substances in the sealant are released into the environment;

e.  When Coal Tar Pavement Sealant waste accumulates in stormwater ponds, the cost of dredging and disposing of the stormwater sediment increases substantially;

f.  Manufacturer Defendants, with knowledge of the risks of using Refined Coal Tar in sealants, failed to use reasonable care and ignored these risks, and marketed and sold Coal Tar Pavement Sealants for application throughout Minnesota;

g.  Coal Tar Pavement Sealants pose greater danger to the environment than would be expected by ordinary persons exercising reasonable care;

h.  The risks that Coal Tar Pavement Sealants pose to the environment outweigh their utility in acting as pavement sealants;

i.  Refined Coal Tar is not a necessary component of pavement sealant. Safe and feasible alternatives to Refined Coal Tar exist and have been available at all times relevant to this litigation for the purposes of acting as a binding agent.  Such sensible alternatives include asphalt-based tar.

183.    The above-described defects exceeded the knowledge of the ordinary person and by the exercise of reasonable care Plaintiff would not be able to avoid the harm caused by Manufacturer Defendants' Coal Tar Pavement Sealants.

184.    Manufacturer Defendants' Coal Tar Pavement Sealants were distributed and sold in the manner intended or reasonably foreseen by Manufacturer Defendants, or as should have been reasonably foreseen by them.

185.    Manufacturer Defendants' Coal Tar Pavement Sealants reached purchasers, consumers and the environment in a condition substantially unchanged from that in which it left their control.

186.    Manufacturer Defendants' Coal Tar Pavement Sealants failed to perform as safely as an ordinary consumer would expect when used in their intended and reasonably foreseeable manner.

187.    Manufacturer Defendants' Coal Tar Pavement Sealants were defective and unreasonably dangerous when these products left Manufacturer Defendants' control.

188.    As a direct and proximate result of Manufacturer Defendants' acts and omissions as alleged in this Complaint, Plaintiff's stormwater ponds and other stormwater infrastructure devices were contaminated with PAHs.   Plaintiff has incurred or will incur substantial investigation, remediation, cleanup, removal, treatment, disposal, and monitoring costs and expenses related to contamination of its property and fulfillment of its obligations as a stormwater system operator, for which Defendants are strictly, jointly, and severally liable.

## FOURTH CLAIM

### Failure to Warn (Manufacturer Defendants)

189.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

190.    As designers, manufacturers, distributors, sellers, suppliers, and/or marketers of Coal Tar Pavement Sealants, Manufacturer Defendants had a strict duty to warn against latent dangers resulting from foreseeable uses of their products that Manufacturer Defendants knew or should have known about.

191.    Manufacturer Defendants knew that customers and their agents would purchase Coal Tar Pavement Sealants and use them without inspection for defects.

192.    Manufacturer Defendants' products purchased or otherwise acquired (directly or indirectly) by third parties were applied, discharged, disposed of, or otherwise released at various locations, at various times, and in various amounts in the vicinity of Plaintiff's stormwater ponds and other stormwater infrastructure.

193.    Over time, these products released PAHs into the environment, and these PAHs accumulated in Plaintiff's stormwater ponds and other stormwater infrastructure devices.

194.    Manufacturer Defendants' products were used in a reasonably foreseeable manner and without substantial change in the condition of such products.

195.    From at least 2004 onwards, Manufacturer Defendants knew or should have known that the use of their Coal Tar Pavement Sealant products in their intended manner would result in the discharge, disposal, or release of PAHs into the environment.

196.    Despite the known and/or reasonably foreseeable hazards to the environment associated with the use of their products in the vicinity of Plaintiff's stormwater ponds and other

stormwater infrastructure devices, Manufacturer Defendants failed to provide adequate warnings of, or take any other precautionary measures to mitigate, those hazards.

197.    In particular, Manufacturer Defendants failed to inform purchasers that as Coal Tar Pavement Sealant wears away, PAHs will be released widely into the environment. Manufacturer Defendants failed to describe this or related hazards or provide any precautionary statements regarding such hazards in the labeling of Coal Tar Pavement Sealants or otherwise.

198.    As a direct and proximate result of the Manufacturer Defendants' failures to warn of the hazards posed by Coal Tar Pavement Sealants generally, and their failure to instruct on the proper use of their products in the vicinity of stormwater ponds or other stormwater infrastructure devices, PAHs from Coal Tar Pavement Sealants contaminate many of Plaintiff's stormwater ponds and other stormwater infrastructure devices.

199.    As a direct and proximate result of the Manufacturer Defendants' acts and omissions as alleged herein, Plaintiff is incurring and will continue to incur damages related to PAH contamination of its stormwater ponds and other stormwater infrastructure devices in an amount to be proved at trial.

200.    Approximately in or around 2004, Manufacturer Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PAH contamination of the environment, and particularly contamination of stormwater ponds and other stormwater infrastructure devices that receive runoff from paved surfaces sealed with Coal Tar Pavement Sealants.

201.    After 2004, Manufacturer Defendants committed each of the above-described acts and omission knowingly and willfully. Such conduct was performed to promote sales of their

products, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on the environment.

202.   Manufacturer Defendants are strictly, jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

## CLAIMS AGAINST ALL DEFENDANTS

### FIFTH CLAIM

### Breach of Implied Warranty of Merchantibility

203.   Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

204.   The Refiner Defendants manufacture and sell Refined Coal Tars that they have specially formulated for use in pavement sealants.

205.   The Refiner Defendants are merchants of these Refined Coal Tars.

206.   These specially formulated tars are refined from raw coal tar and contain extremely high concentrations of PAHs as compared to other binding agents that can be used in pavement sealants.

207.   The Manufacturer Defendants manufacture and sell Coal Tar Pavement Sealants made from these high-PAH Refined Coal Tars.

208.   The Manufacturer Defendants are merchants of Coal Tar Pavement Sealants.

209.   By manufacturing and selling these specially formulated tars and pavement sealant products, Defendants impliedly warranted that Refined Coal Tars containing high concentrations of PAHs, and the Coal Tar Pavement Sealants made from these tars, are merchantable, safe, and fit for ordinary purposes.

210.    The Refined Coal Tars and Coal Tar Pavement Sealants manufactured and sold by Defendants are not fit for the ordinary purposes for which they are used—application to outdoor paved surfaces, particularly if those surfaces are adjacent to or drain to stormwater ponds and storm sewers.

211.    When used in the customary, usual and reasonably foreseeable manner, these products inevitably degrade and release PAHs into the environment, are carried away by stormwater, and tend to accumulate particularly in stormwater ponds and other stormwater infrastructure devices.

212.    This release of PAHs creates a threat to the environment and to the property and stormwater ponds and other stormwater infrastructure owned and/or managed by Plaintiff.

213.    Refined Coal Tars and Coal Tar Pavement Sealants manufactured with Refined Coal Tar are dangerous to an extent beyond that which would be contemplated by the ordinary consumer because the ordinary consumer or paving contractor would not expect that applying a coal tar based sealant will cause the immediate and continuing release of PAHs from the paved surface into the air, the adjacent soil, and into Plaintiff's stormwater ponds and other stormwater infrastructure, at levels that cause exceedances of Minnesota's Soil Reference Values.

214.    Accordingly, these products are not minimally safe for their expected purpose.

215.    Defendants have breached the implied warranty of merchantability.

216.    Refiner Defendants have known or should have known, from the outset, that their products contain high levels of PAHs that will be released to the environment if used in pavement sealant.

217.    Since at least 2004, Manufacturer Defendants, and the Refiner Defendants prior to this time, have been aware that their products release PAHs to the environment.  At present,

Defendants are aware of years of research indicating that those PAHs accumulate in many places, including particularly in urban stormwater ponds.  Therefore, it is reasonable for both Refiner Defendants and Manufacturer Defendants to expect that cities, including the Plaintiff in this action, would use, consume or be affected by the Refined Coal Tars and Coal Tar Pavement Sealants manufactured and sold by the Defendants.

218.    As a direct and proximate result of Defendants' breach of warranty, Plaintiff has suffered property damage, requiring investigation and remediation in an amount to be determined at trial.

219.    The Defendants are strictly, jointly, and severally liable for all such damages.

## SIXTH CLAIM

### Trespass

220.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

221.    Plaintiff is the owner of property, specifically stormwater ponds and other stormwater infrastructure devices intended to capture stormwater runoff.  Defendants knew or should have known that the use of their products in their intended manner would result in the discharge, disposal, or release of PAHs into the environment, including the property and other rights of Plaintiff.

222.    Defendants trespassed on the lands of Plaintiff by causing PAHs to contaminate the property of Plaintiff, including but not limited to, contamination by particles.

223.    Defendants' trespass was intentional, willful, wanton, and with reckless disregard.

224.    Defendants' trespass was unauthorized.

225.    As a direct and proximate result of Defendants' trespass, Plaintiff has been damaged or will incur damages related to PAH contamination of its stormwater ponds and other stormwater infrastructure including all costs to investigate, monitor, abate, contain, prevent, treat, remove, and dispose of PAHs from their property.

## SEVENTH CLAIM

### Nuisance

226.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

227.    Minn. Stat. § 561.01 provides that: "[a]nything which is injurious to health, or indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, is a nuisance.  An action may be brought by any person whose property is injuriously affected or whose personal enjoyment is lessened by the nuisance, and by the judgment the nuisance may be enjoined or abated, as well as damages recovered."

228.    Plaintiff is the owner of property, specifically stormwater ponds and other stormwater infrastructure devices intended to capture stormwater runoff.

229.    Defendants' activities, as alleged herein, have resulted in the contamination of Plaintiff's stormwater ponds and other stormwater infrastructure devices intended to capture stormwater runoff.

230.    The nuisance conditions caused, contributed to, maintained, assisted and/or participated in by the Defendants have caused substantial injuries to Plaintiff's properties.

231.    The nuisance conditions caused, contributed to, maintained, assisted and/or participated in by the Defendants are indecent or offensive to the senses, or an obstruction to the

free use of property, so as to interfere with the comfortable enjoyment of life or property because Plaintiff can no longer use its stormwater ponds and other stormwater infrastructure devices in the manner intended, in that they have been contaminated with PAHs.  Plaintiff has incurred ors will incur investigation, treatment, testing, waste disposal and monitoring costs to address this contamination on its property.

232.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff's stormwater ponds and other stormwater infrastructure devices have been contaminated, causing significant injury and damages.  As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has incurred or will incur investigation, treatment, testing, waste disposal and monitoring costs and expenses exceeding $75,000 related to the contamination.

## EIGHTH CLAIM

### Negligence

233.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

234.    As designers, manufacturers, refiners, formulators, sellers, marketers and suppliers of Coal Tar Pavement Sealants and of Refined Coal Tar products for use in Coal Tar Pavement Sealants, Defendants owed a duty to all persons whom Defendants' Refined Coal Tar and Coal Tar Pavement Sealant products might foreseeably harm, including Plaintiff.

235.    Defendants also had a duty not to contaminate the environment.

236.    At all times relevant to this litigation, Defendants knew or should have known the facts set forth above establishing that their products are inherently defective and unreasonably dangerous when used in the ordinary manner.

237.     Defendants have negligently breached their duties of care to Plaintiff by: marketing and selling Coal Tar Pavement Sealants and Refined Coal Tar for use in pavement sealants; negligently causing the release of PAHs and other contaminants into the environment; and failing to remediate PAHs released into the environment.

238.     In light of Defendants' actions, Plaintiff would not have been able to avoid the harm caused by Coal Tar Pavement Sealants and Refined Coal Tar through the use of reasonable care.

239.     Refined Coal Tar and Coal Tar Pavement Sealants were distributed, sold, and used in the manner intended or reasonably foreseen by Defendants, or as should have been reasonably foreseen by Defendants.

240.     Refined Coal Tar and Coal Tar Pavement Sealants reached consumers and the environment in a condition substantially unchanged from that in which they left Defendants' control.

241.     Coal Tar Pavement Sealants containing Refined Coal Tar failed to perform as safely as an ordinary consumer would expect when used in their intended and reasonably foreseeable manner.

242.     As a direct and proximate result of Defendants' acts and omissions as alleged in this Complaint, Plaintiff's property was and is contaminated with PAHs.  Plaintiff has incurred or will incur substantial investigation, remediation, cleanup, removal, treatment, waste disposal, and monitoring costs and expenses related to contamination of Plaintiff's property in an amount in excess of $75,000, for which Defendants are strictly, jointly, and severally liable.

## NINTH CLAIM

## Consumer Fraud

243.     Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

244.     Under the Minnesota Consumer Fraud Act, Minn. Stat. § 325F.69, "the act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable" and a civil action lies against the person engaged in such deceptive conduct by those injured.

245.     Defendants have made misleading statements that misrepresent the safety and effects of their products and have omitted material facts that they had a duty to disclose about the dangers of their products, with the intent that purchasers would rely on their statements and omissions and buy Refined Coal Tar and Coal Tar Pavement Sealants.

246.     Koppers, Inc. advertises on its website, and states in marketing materials, that its Refined Coal Tars conform to ASTM standards, protect parking lots and residential driveways, extend their service life, and enhance their appearance.

247.     Coopers Creek Chemical Corporation describes its products made from Refined Coal Tars as "protective coatings."  The company describes its Black Velvet Blacktop Sealer as "superior to asphalt driveway sealers."

248.     Stella-Jones, Inc. and Stella-Jones Corp. present themselves on the Stella-Jones website and in the parent company's annual reports as responsible corporations that are committed to environmental health and safety stewardship, that protect the environment, and

whose objectives are to be model corporate citizens, exercising both environmental responsibility and overall integrity.

249.    Ruetgers Canada Inc., Rain Carbon Holdings LLC, Rain Carbon Inc. operate a joint website on which they claim that their companies serve industrial customers with "quality...coal tar pitch and distillates." The website also states that, "Our vision is to be the world's most trusted provider of diversified carbon products and advanced materials renowned for delivering high-quality products safely, reliably, efficiently and responsibly." They further claim to minimize impact on the environment because they are "committed to a sustainable environment and promot[ing] the harmony of humans with nature in the objective of maintaining the ecological, social and economic well-being of future generations."

250.    Lone Star Specialties, LLC states that the Refined Coal Tars that it produces conform to ASTM standards, describes these tars as appropriate for use in protecting runways, roads, and parking lots, and suggests to the public that the use of coal tar sealants is beneficial and part of "a good preventative maintenance plan."

251.    Bonsal American, Inc., the manufacturer of a number of Coal Tar Pavement Sealants marketed under the GemSeal name, states that customers should "Trust GemSeal for your asphalt pavement maintenance.  GemSeal is one of the largest producers of pavement coatings in the country.  Our products have been used successfully for over 50 years on a wide range of applications."  Bonsal describes its PolyTar product, one of several coal tar based products, as the "longest lasting pavement sealer on the market" and states clearly on its website that "GemSeal stands for Quality."

252.    STAR, Inc. markets its "refined tar based sealcoatings" as products whose "primary purpose is to PROTECT your Asphalt."  STAR claims use of their coal tar pavement

sealants "enhances your Business Image & Property Values as well." STAR also advertises its products' resistance to abrasion, erosion, and weather.  And STAR's marketing also includes the statement that its Refined Coal Tar based products meet ASTM and federal standards.

253.    The Brewer Company claims to provide "reliable, consistent, high quality" coal tar sealant products that "safely satisfy customers" and "extend the life of the pavement and protect the investment it represents."  The Brewer Company markets its "J485 refined tar emulsion sealer" as a sealant product with "exceptional wear resistance" that "meets or exceeds all composition and performance requirements of ASTM Specification D5727."

254.    Vance Brothers, Inc. markets ProtectTar Coal Tar Emulsion Sealer as a product that "protects and beautifies asphalt pavement, resists petroleum products, retains color, will not oxidize and dries to a flat black finish."

255.    Defendants' marketing materials, websites, and statements omit any mention that Refined Coal Tars contain significant volumes and concentrations of toxic PAHs and that if these Refined Coal Tars are used to make Coal Tar Pavement Sealant, these PAHs gradually migrate from the sealed pavement and contaminate the wider environment.

256.    Defendants do not state that environmental contamination begins immediately upon application, when PAHs begin to volatilize off the sealed asphalt surface, and continues for several years as the sealant deteriorates, detaches from the pavement surface, and releases PAHs into the environment.

257.    Further, Defendants statements, which are directed at existing purchasers and at the public at large, are misleading because they create the impression that the Refined Coal Tars manufactured by Refiner Defendants, and Coal Tar Pavement Sealants made from such Refined Coal Tars by Manufacturer Defendants, are safe to use on parking lots and residential driveways,

that these products have a long lifetime, and that these products enhance property values and reduce maintenance expenses.  Defendants knew these statements were not true at the time they made them.

258.    Defendants' public statements are false or at best misleading and misrepresent the truth: use of these products harms the environment, the products degrade quickly, and rather than improving properties and reducing maintenance expenses, they cause property damage (*i.e.* contamination) and increase maintenance expenses for users and for landowners such as Plaintiff.

259.    Further, Defendants' claims that Refined Coal Tars and Coal Tar Pavement Sealant products meet various governmental standards and specifications creates the misleading impression that the government has approved the use of these products as safe for the public and the environment.

260.    As described above, certain Defendants have also made statements about the safety and quality of their products, the harms their products cause to the public and the environment, and the state of scientific research in this field that are demonstrably false.  As stated above, these Defendants knew these statements to be false when they were made.

261.    Defendants' false, deceptive and misleading statements and practices were intended to boost sales of their products and prevent local and/or state bans of their products.

262.    Defendants' false, deceptive and misleading statements and practices drove sales and use of Coal Tar Pavement Sealants made with Refined Coal Tar in Minnesota, and thus contributed directly, proximately and significantly to Plaintiff's injuries.

## TENTH CLAIM

### Fraudulent Misrepresentation

263.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

264.    Defendants falsely represented that their products were safe to use by the public, knowing that they contain high levels of PAHs that inevitably enter the environment.

265.    Specific statements by Defendants are set forth in the paragraphs above.

266.    Defendants made these statements knowing that they were false or knowing that they lacked the knowledge necessary to determine whether they were true or false.

267.    Defendants made these statements with the intention that the public would continue the widespread use of the Coal Tar Pavement Sealants containing Refined Coal Tar and that governmental regulators and entities would refrain from banning their use.

268.    Defendants' misrepresentations caused the public to continue to use the products in reliance on Defendants' misrepresentations that the products are safe.  Further, governmental entities' reliance on statements from the PCTC resulted in delays in banning Coal Tar Pavement Sealants and further contributed to the contamination.

269.    As a result of this reliance, Plaintiff has suffered damages in the form of increased costs for the maintenance of its stormwater ponds and other stormwater infrastructure.

### ELEVENTH CLAIM

### Fraudulent Concealment

270.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

271.     Defendants intentionally concealed and failed to disclose to Plaintiff and to public authorities and/or agencies material facts concerning the extent, concentrations and effects of the PAHs in Refined Coal Tar and Coal Tar Pavement Sealant made from Refined Coal Tar.

272.     Defendants intentionally concealed such material information.

273.     Defendants knew or should have known that private property and/or stormwater ponds, including specifically Plaintiff's ponds, would be exposed to PAHs.

274.     Defendants were well aware of the environmental risks posed by PAHs in Refined Coal Tar and Coal Tar Pavement Sealant.

275.     Despite this, Defendants continued to manufacture, supply, sell and use Refined Coal Tar and Coal Tar Pavement Sealants made with Refined Coal Tar.

276.     The Defendants intended that Plaintiff, the public and governmental agencies would rely on the PCTC's statements to continue purchasing and using Coal Tar Pavement Sealants made with Refined Coal Tar and intended that the government would rely on Defendants' statements to delay or not take action to restrict and/or ban use of these products.

277.     Defendants intentionally and wrongfully concealed their actions in developing, selling, and using a product that they knew was harmful to the environment, and knew would accumulate in the stormwater ponds and other stormwater infrastructure of Plaintiff, causing damages.

278.     Plaintiff requests a Declaratory Judgement stating that Defendants are estopped from raising any and all defenses pertaining to the timeliness of Plaintiff's claims.

## CIVIL CONSPIRACY

## (PCTC DEFENDANTS)

279.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

280.    As described above, PCTC Defendants knowingly and voluntarily engaged in a common plan and concerted action to commit, assist, and/or encourage a tortious act among Defendants.  Specifically, PCTC Defendants agreed to act together through the PCTC for the ostensible purpose of providing information about Refined Coal Tars and the Coal Tar Pavement Sealant products made from these Refined Coal Tars to the public and to government agencies, but with the true, unlawful purpose of:

> a.  Creating and maintaining a market for Coal Tar Pavement Sealants made with Refined Coal Tar with full knowledge of the hazards coal tar poses;
>
> b.  concealing, suppressing or minimizing information regarding the dangers of Refined Coal Tars and the Coal Tar Pavement Sealant products made from these Refined Coal Tars, plotting to deceive consumers, the government and the public about the dangers of their products;
>
> c.  making false and misleading statements regarding scientific research on the release of PAHs from coal tar sealants by falsely questioning the scientists' credibility and objectivity to delay regulatory action that would reduce the market for the PCTC Defendants' defective and dangerous products; and

    d.   maximizing profits in a way PCTC Defendants knew would require them to contaminate private property and/or stormwater ponds, including specifically Plaintiff's ponds.

281.    These actions were not undertaken by each PCTC Defendant acting individually; rather, the Defendants in many instances joined together and made specific agreements to commit unlawful acts, or lawful acts by unlawful means, and to accomplish unlawful purposes.

282.    Some PCTC Defendants have not only agreed to and supported the PCTC's conduct, but have amplified this conduct through their own independent actions.

283.    The PCTC Defendants agreed to act and acted together to carry out the underlying acts that give rise to each of the following claims:

    a.   **Fraudulent misrepresentation**: The PCTC Defendants made statements that misrepresented the safety of their products to the public at large and falsely assured the public that their products are safe and effective. PCTC Defendants also made statements that misrepresented the state of the scientific evidence about the harms caused by their products.  The PCTC Defendants made such statements in order to enhance the marketing of their products, intending that their products would continue to be widely used even though they knew that they posed an unreasonable risk of harm. At the same time, the PCTC Defendants made false statements to delay governmental efforts to regulate their products and sealant products made from Refined Coal Tar.  At all times when they made these statements and worked to avoid government regulation, the PCTC Defendants knew that they lacked the knowledge necessary to proclaim that their products were

safe or that the scientists researching their products were somehow compromised.  Further, the PCTC Defendants knew that their claims of safety were false, as were their repeated criticisms of scientists who raised concerns about Refined Coal Tar and coal tar pavement sealants;

b.   **Fraudulent concealment**: Although they had a duty to alert users and the wider public to the dangers of their products, the PCTC Defendants knowingly and actively concealed material facts about the dangers posed by their products.  The PCTC Defendants intended that the public would rely on the PCTC's statements to continue purchasing and using Refined Coal Tar pavement sealants and intended that the government would rely on the PCTC's statements to delay or not take action to restrict use of these products.

c.   **Trespass:** PCTC Defendants had knowledge that Coal Tar Pavement Sealant in its intended use deteriorates and detaches from the pavement surface, and would result in the discharge, disposal, or release of PAHs into the environment, including onto the property and other rights of Plaintiff.

d.   **Consumer Fraud in violation of Minn. Stat. 325F.69**: PCTC Defendants made use of fraudulent, false, and misleading statements and deceptive practices issued through the PCTC, examples of which are detailed above, with the intent that that the public would rely on the PCTC's statements in purchasing and using Refined Coal Tar pavement sealants.

e.  **Nuisance:** PCTC Defendants conspired and acted to maintain the market for their products even after learning that their products were injurious, obstructed the free use of property by contaminating it with pollutants, and interfered with the comfortable enjoyment of property in the same manner.

284.  PCTC Defendants collectively decided to use Coal Tar Pavement Sealant rather than other pavement sealants made with alternative binding agents, such as asphalt, which contain substantially lower levels of PAHs.

285.  As a direct result of these concerted actions to protect Refined Coal Tars and the Coal Tar Pavement Sealant products made from these Refined Coal Tars, PCTC Defendants continued to manufacture products that contained millions of pounds of PAHs each year, and continued to contaminate the environment and specifically Plaintiff's stormwater ponds and other stormwater infrastructure.

286.  Additionally, the PCTC Defendants routinely intervened in government proceedings throughout Minnesota in order to delay or stop passage of restrictions on the use of Coal Tar Pavement Sealants, arguing that there is insufficient evidence to support such actions.

287.  The PCTC Defendants' goal has been to keep the public buying and using Coal Tar Pavement Sealants made from Refined Coal Tar, and to dissuade regulators from banning the manufacture, use and sale of these products.

288.  In support of this goal, the PCTC Defendants have denied that Refined Coal Tar and the Coal Tar Pavement Sealants made from them are significant sources of PAHs, have claimed that there is not enough evidence that their products pose environmental safety risks to restrict or ban their use, and have downplayed the risks posed by the PAHs released from their products.

289.    Defendants continued this course of action in Minnesota for years in the face of a steadily rising volume of contrary evidence emerging from impartial scientific research conducted at the U.S. Geological Survey, the Minnesota Pollution Control Agency, the University of Minnesota, and elsewhere, showing that Coal Tar Pavement Sealants made with Refined Coal Tar have caused significant contamination.

290.    These actions were taken with the intent that consumers and intermediaries throughout Minnesota would rely on them and continue to purchase and apply defective and dangerous Coal Tar Pavement Sealants.

291.    These actions were taken with intent to forestall government action that would restrict the use of the PCTC Defendants' defective and dangerous products.

292.    As a result of the actions agreed to and taken by the PCTC Defendants, the public continued buying and using the PCTC Defendants' products, multiple governments in Minnesota delayed in restricting and/or banning the use of these products longer than they would have otherwise, and more PAHs accumulated in Plaintiff's stormwater ponds and other stormwater infrastructure, causing nuisance and damages including increased costs for the maintenance of its stormwater ponds and infrastructure.

## JOINT AND SEVERAL LIABILITY

293.    The injuries to Plaintiff's property caused and/or threatened by Defendants' acts and omissions as alleged in this Complaint are indivisible.

294.    Coal Tar Pavement Sealants made with each Refiner Defendant's Refined Coal Tar products were used throughout Plaintiff's city.

295.    Coal Tar Pavement Sealants made by the Manufacturer Defendants were used throughout Plaintiff's city.

296.     As the sealants degraded, PAHs from each Defendant's products spread widely, affecting all of Plaintiff's stormwater ponds and other stormwater infrastructure.

297.     Further, it is impossible, based upon physical characteristics, to identify the manufacturer or refiner of any given quantity of Refined Coal Tar or Coal Tar Pavement Sealant that was the source of PAHs found in Plaintiff's stormwater ponds and other stormwater infrastructure devices.

298.     Plaintiff must therefore pursue all Defendants, jointly and severally, for those injuries that Defendants have collectively visited upon Plaintiff.  Defendants are collectively liable under traditional causation theories as well as theories of market share liability, alternative liability, conspiracy or concert of action liability, and/or enterprise liability for injuries caused by Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests a trial of this Action before a jury, and that, upon a favorable verdict, this Court enter judgment in favor of Plaintiff and against Defendants, awarding Plaintiff:

a.     Compensatory damages according to proof;

b.     Injunctive and equitable relief to compel Defendants to abate the continuing nuisance by removing toxic chemicals, including PAHs, from the City's stormwater ponds and other stormwater infrastructure devices;

c.     Costs of litigation;

d.     Prejudgment interest;

e.     Attorneys' fees; and

f.     Such other and further relief as the Court may deem just and proper.

DATED:        March 4, 2019

By:     */s/ Daniel R. Shulman*
        Daniel R. Shulman, #100651
        Janet C. Evans, #182734
        **GRAY PLANT MOOTY**
        500 IDS Center
        80 South Eighth Street
        Minneapolis, MN 55402
        Telephone:  612-632-3335
        Facsimile:  612-632-4335
        daniel.shulman@gpmlaw.com
        janet.evans@gpmlaw.com
        ***Attorneys for Plaintiff***

        */s/ Robin L. Greenwald*
        Robin L. Greenwald, Esq.
        Nancy Christensen, Esq.
        (admitted *Pro Hac Vice*)
        **WEITZ & LUXENBERG, P.C.**
        700 Broadway
        New York, NY  10003
        Telephone:  212-558-5505
        Facsimile:  212-344-5461
        rgreenwald@weitzlux.com
        nchristensen@weitzlux.com
        ***Attorneys for Plaintiff***

        */s/ Edan Rotenberg*
        Edan Rotenberg
        (admitted *Pro Hac Vice*)
        **SUPER LAW GROUP, LLC**
        180 Maiden Lane, Suite 603
        New York, NY 10038
        Telephone: 212-242-2355
        Facsimile: 855-242-7956
        edan@superlawgroup.com
        ***Attorneys for Plaintiff***